# Illinois Official Reports

## Appellate Court

---

## *People v. Cisco*, 2019 IL App (4th) 160515

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD D. CISCO, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-16-0515 |
| Filed | January 28, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 16-CF-70; the Hon. Thomas J. Difanis, Judge, presiding. |
| Judgment | Affirmed as modified and remanded with directions. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Stephen L. Gentry, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and Linda Susan McClain, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justice Knecht concurred in the judgment and opinion.<br>Justice Steigmann specially concurred, with opinion. |

**OPINION**

¶ 1        Following a jury trial, defendant was convicted of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2014)) and violation of an order of protection (*id.* § 12-3.4(a)). The trial court sentenced him to consecutive prison terms of six and three years, respectively. Defendant appeals, arguing (1) the court erred in imposing an extended-term sentence in connection with his domestic battery conviction, (2) the court abused its discretion when imposing his sentences, and (3) he is entitled to $475 in monetary credit toward imposed fines. We reduce defendant's sentence for domestic battery to the maximum nonextended term of three years' imprisonment and remand with directions that the court modify its written order setting forth imposed fines to show defendant's entitlement to $475 in monetary credit. We otherwise affirm the court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3        On January 15, 2016, the State charged defendant with the felony offense of unlawful restraint (*id.* § 10-3(a)) (count I) and the misdemeanor offenses of violation of an order of protection (*id.* § 12-3.4(a)) (count II) and domestic battery (*id.* § 12-3.2(a)(1)) (count III). Later that same month, the misdemeanor charges against defendant (counts II and III) were dismissed on the State's motion, and the State added two additional felony counts against defendant, charging him with felony violation of an order of protection (*id.* § 12-3.4(a), (d)) (count IV) and felony domestic battery (*id.* § 12-3.2(a)(1), (b)) (count V). Both additional counts were based on allegations that defendant had previously been convicted of violating an order of protection.

¶ 4        In March 2016, defendant's jury trial was conducted. Prior to trial, the State noted that the charging instrument identified counts IV and V as extended-term eligible. However, it asserted that the charging instrument was incorrect and defendant was not eligible for extended-term sentencing.

¶ 5        At trial, the State presented evidence that defendant and the victim, Zara Dawkins, had been in a dating relationship that ended in November 2015. The parties stipulated that on November 24, 2014, Dawkins was granted an order of protection against defendant that required him to stay at least 500 feet away from both her and her residence. Defendant was in court when the order of protection was entered and was provided with a copy of the order. The State's evidence further showed that on the evening of December 26, 2015, defendant went to Dawkins's home and forced his way inside. He threatened Dawkins and another person in the home. Dawkins testified defendant repeatedly hit her on the face, grabbed her by her arms, and threw her to the ground. Defendant also took Dawkins's car keys and her cell phone. Eventually, the police arrived on the scene and defendant fled. The State's evidence further showed that Dawkins sustained bruising on her upper arms as a result of defendant's actions.

¶ 6        The jury found defendant not guilty of unlawful restraint but guilty of both felony domestic battery and violation of an order of protection. In April 2016, defendant filed a motion for an acquittal or, in the alternative, a new trial.

¶ 7        In May 2016, the trial court denied defendant's posttrial motion and conducted his sentencing hearing. In aggravation, the State presented the testimony of four witnesses. Police officer Justus Clinton testified that he met with Dawkins on January 24, 2016, at the police

department. Dawkins reported that defendant had violated an order of protection and no contact order. She showed Clinton the call log on her cell phone, demonstrating that 47 phone calls were made to Dawkins during an approximate 24-hour period on January 22 and 23, 2016. According to Clinton, the calls were "placed by a spoofing app," which is used to disguise a caller's identification. He stated that the call log on Dawkins's phone showed that the calls she received were from Naples, Florida; however, Dawkins reported that she did not know anyone at that location.

¶ 8        Steven Meadows testified that he was friends with Dawkins and that the two were in a dating relationship. In the early morning hours of January 23, 2016, Meadows was playing darts with Dawkins and her brother when Dawkins received a phone call. Meadows answered Dawkins's phone and spoke to the person calling. He testified he was able to identify the caller as defendant "from talking to [defendant] previously." According to Meadows, defendant asked to speak with Dawkins. Meadows told defendant to "leave [Dawkins] alone," and indicated that he and Dawkins were dating. He testified that defendant threatened him and claimed that defendant "and his boys" were watching. Meadows testified that defendant also stated he was "not going to stop until [Dawkins] got blood on her head."

¶ 9        Melissa Edwards testified she was a registered nurse and worked with Dawkins. While at work on December 30, 2015, Dawkins received a phone call. Edwards "recognized the number from previous phone calls" and told Dawkins "not to answer." Edwards testified she answered the call and that the caller was a man who asked to speak with Dawkins. Edwards told the caller that Dawkins was not working. She stated the man called back about 10 minutes later and said he was with a flower company and had a flower delivery for Dawkins. She further testified as follows:

> "I said that they could be delivered to the front main lobby desk. He said that somebody would have to sign for them. And I said well, anyone can sign for flowers, that we do this pretty often and that he didn't need to know where she worked. He said he had to check with his manager and he would call me back in [10] minutes and never did."

Edwards stated she had, again, informed the man that Dawkins was not working and he "seemed aggravated."

¶ 10       Finally, Rebecca Scott, Dawkins's mother, testified regarding Dawkins's relationship with defendant and their breakup. She asserted that she also obtained an order of protection against defendant because he was harassing her. Scott testified defendant threatened her on the day she got the order of protection, stating that he mouthed " 'I'll get you' " while they were in the courtroom. Scott further stated that Dawkins had a son who was "terrified" and constantly wondered where defendant was and whether defendant would be able to hurt him or Dawkins.

¶ 11       Other matters considered by the trial court included a victim impact statement prepared by Dawkins, a letter written by defendant's parents, and a presentence investigation report. The report showed that defendant was 29 years old. As a child, his biological father was "in and out of jail/prison" and his biological mother had substance abuse issues. At age seven, defendant was adopted. He reported that he had a good relationship with his adoptive parents. In 2004, defendant graduated high school. During his senior year, he also attended a vocational school and received a certificate of completion in media communications. He attended college for about a year and a half before dropping out to work full time. Defendant's employment history included working as a cook at various restaurants.

¶ 12 The report showed that defendant was the father of two children. He was in arrears with respect to child support payments for his oldest child; however, no child support order had been entered with respect to defendant's youngest child, who was only five months old. Additionally, defendant reported that he suffered from depression and anxiety and that alcohol had been a problem for him in the past.

¶ 13 According to the report, defendant had a criminal history that included convictions for numerous traffic-related offenses and misdemeanor convictions for criminal damage to property in 2009, violation of an order of protection in 2010, driving under the influence of drugs in 2012, and resisting a peace officer in 2012 and 2014. In August 2015, defendant was sentenced to 24 months of "second chance probation" for theft, a Class 3 felony offense, in a Sangamon County case. In April 2016, the State filed a petition to revoke defendant's probation. A hearing on the petition to revoke was scheduled to take place after the date of defendant's sentencing in the case at bar.

¶ 14 The report further showed that between June 2009 and November 2015, 12 requests were made by 10 different women for orders of protection or no contact orders against defendant. For 9 of those requests, plenary orders of protection or plenary stalking no contact orders were ultimately entered against defendant. Of the remaining 3 requests, emergency, but not plenary, orders of protection were entered against defendant. Defendant also had pending felony charges for forgery, financial institution fraud, violation of an order of protection, and harassment through electronic communications. Finally, when questioned about his pending sentencing in this case, defendant reported that the " 'offense ha[d] been blown out of proportion' " and " 'that it was entrapment.' "

¶ 15 The State recommended that the trial court impose the maximum possible penalty for defendant, arguing that he had a significant criminal history and noting that he committed the offenses at issue while on probation. Defendant's counsel argued that a sentence of probation was appropriate, asserting that this case represented defendant's first felony conviction as his August 2015 conviction involved "a second chance probation plea" and had "not been officially disposed of yet" due to his pending cases. He also pointed out that defendant had a supportive family, obtained his high school diploma, had some college experience, and had an ability to obtain and maintain employment. Defense counsel maintained that a community-based sentence would allow defendant the opportunity to address his mental health, substance abuse, and relationship issues. Defendant spoke on his own behalf and asserted he took "full responsibility for [his] actions." He apologized for his actions and asked for the opportunity to address his "problems from the outside."

¶ 16 In rendering its decision, the trial court noted that there was "some mitigation" in the record, in that defendant was relatively young, had obtained his high school diploma, and had "been able to obtain at some points minimum wage employment." The court found statutory factors in aggravation were defendant's "substantial" criminal history and "the deterrent factor." The court also noted the numerous requests for orders of protection against defendant. It determined that a community-based sentence would be "totally inappropriate" and would deprecate the seriousness of defendant's conduct. Ultimately, the court sentenced defendant to "an extended term sentence of six years" for domestic battery and a three-year sentence for violation of an order of protection. It ordered defendant's sentences to be served consecutively, again, noting that defendant had been the subject of numerous order of protection requests.

Additionally, the court stated defendant was entitled to credit for 95 days served and "credit for $475 for time spent in custody."

¶ 17   After the trial court set forth its sentencing decision, defendant's counsel informed the court that defendant was not extended-term eligible. The court, however, did not alter its ruling and stated that the matter could be taken up in a motion to reconsider. In May 2016, defendant filed a motion to reconsider his sentence, arguing he had been admonished at the start of trial that he was not extended-term eligible and asserting as follows:

> "[Defendant] does not have a prior felony conviction. [Defendant] was granted a sentence of Second Chance Probation in [the Sangamon County theft case] under [section 5-6-3.4 of the Unified Code of Corrections (Code) (730 ILCS 5/5-6-3.4 (West 2014))]. This probation was in effect at the time of the commission of the crime, trial[,] and sentencing in [the case at issue]. The [s]tatute requires deferment of further proceedings until the filing of a petition alleging violation of a term of probation. Additionally, under [section 5-6-3.4] upon a violation of a term of probation[,] the court may enter a judgment of guilt. None of these events occurred."

Defendant also argued the sentences imposed by the court were excessive, in that the court placed too much weight on aggravating factors and gave inadequate consideration to defendant's potential for rehabilitation and mitigating evidence.

¶ 18   In July 2016, the trial court conducted a hearing on defendant's motion to reconsider his sentence. Defendant's counsel reasserted that defendant had been sentenced outside of the applicable sentencing range for the domestic battery offense. She further argued that the court should have imposed concurrent rather than consecutive sentences. In response, the State argued as follows:

> "Your Honor, I would note that the Defendant did not have a prior felony conviction. He was on statutory second chance [probation] in the Sangamon County [theft] case.
>
> However, the sentence can remain at six years because he was admonished before trial of permissive consecutive sentence [*sic*], and he was found guilty of two Class 4 felony counts. So I believe six years is the legal sentence, and I'd ask that it stand."

The court then denied defendant's motion to reconsider without further comment.

¶ 19   This appeal followed.

## II. ANALYSIS

### A. Extended-Term Sentence

¶ 22   On appeal, defendant first argues the trial court erred by imposing six-year, extended-term sentence in connection with his domestic battery conviction. He contends that under the extended-term sentencing statute, the only "nearly relevant factor" that might have permitted an extended-term sentence in his case required him to have a previous felony conviction. Defendant maintains, however, that although he had previously been found guilty of felony theft, he did not technically have a conviction for that offense because he received "second chance probation." The State concedes this issue.

¶ 23   "[W]hether the trial court has imposed an unauthorized sentence is a question of law which we will review *de novo*." *People v. Smith*, 345 Ill. App. 3d 179, 189, 802 N.E.2d 876, 884 (2004). When a defendant has a prior conviction for violation of an order of protection, like

defendant did in this case, the offense of domestic battery is a Class 4 felony. 720 ILCS 5/12-3.2(b) (West 2014). The applicable sentencing range for a Class 4 felony is one to three years' imprisonment. 730 ILCS 5/5-4.5-45(a) (West 2014). However, if a defendant is subject to an extended-term sentence, the applicable sentencing range is three to six years' imprisonment. *Id.*

¶ 24     Section 5-5-3.2(b) of the Code (*id.* § 5-5-3.2(b)) sets forth several factors that may be considered by the trial court as reasons to impose an extended-term sentence. One factor concerns whether the defendant has been

> "convicted of any felony, after having been previously convicted *** of the same or similar class felony or greater class felony, when such conviction has occurred within 10 years after the previous conviction *** and such charges are separately brought and tried and arise out of different series of acts." *Id.* § 5-5-3.2(b)(1).

¶ 25     Additionally, the Code provides that, under certain circumstances, a trial court may sentence a defendant who has pleaded guilty or been found guilty of certain enumerated offenses, including felony theft, to second chance probation "without entering a judgment." *Id.* § 5-6-3.4(a).

> "When a defendant is placed on [second chance] probation, the court shall enter an order specifying a period of probation of not less than 24 months and shall defer further proceedings in the case until the conclusion of the period or until the filing of a petition alleging violation of a term or condition of probation." *Id.* § 5-6-3.4(b).

"Upon fulfillment of the terms and conditions of probation, the court shall discharge the person and dismiss the proceedings against the person." *Id.* § 5-6-3.4(f). However, "[u]pon violation of a term or condition of probation, the court may enter a judgment on its original finding of guilt and proceed as otherwise provided by law." *Id.* § 5-6-3.4(e).

¶ 26     Here, the State initially asserted in the charging instrument that defendant was subject to extended-term sentencing for both the offenses of felony domestic battery and felony violation of an order of protection. However, prior to trial, it informed the court that it was mistaken and defendant was not actually subject to an extended term for either offense. Although defendant's criminal history indicates he either pleaded guilty or was found guilty of a greater class felony—theft, a Class 3 felony—within the previous 10 years, it also shows that he was sentenced to second chance probation in connection with that offense. Moreover, the record fails to support a finding that, prior to sentencing in this case, the trial court in defendant's theft case ever revoked defendant's probation or entered a judgment on its finding of guilt in that case. Accordingly, we agree with the parties that the trial court in this case was not authorized to impose an extended-term sentence.

¶ 27     Defendant asks this court to strike the extended-term portion of his six-year domestic battery sentence, reducing it to three years, or to remand for the imposition of a new sentence. The State contends we should reduce defendant's sentence for domestic battery to the maximum nonextended term of three years in prison and that remanding the cause for resentencing is unnecessary "since the record establishes the [trial] court's intent to impose a sentence beyond the maximum non-extended term." See *People v. Taylor*, 368 Ill. App. 3d 703, 709, 859 N.E.2d 20, 26 (2006) (finding it was not necessary to remand the case after finding the defendant had improperly been sentenced to an extended term where the record established that the trial judge "intended to impose the maximum available sentence for each conviction").

¶ 28    Here, defendant does not dispute the State's argument on appeal, and we agree that the record demonstrates an intention by the trial court to sentence defendant to the maximum available sentence for both of his convictions. Therefore, as suggested by both parties, we reduce defendant's sentence for domestic battery to three years' imprisonment.

¶ 29                            B. Excessive Sentence

¶ 30    On appeal, defendant also argues that his sentence was excessive. He asserts that the imposition of a sentence at the maximum aggregate term was not justified because he had no prior felony convictions entered against him and had not previously been sentenced to a term of imprisonment in the Illinois Department of Corrections (DOC). Defendant also maintains that his case involved substantial mitigating factors, including a difficult upbringing, as well as substance abuse and mental health issues. Further, he maintains that he was "not without rehabilitative potential" and that imposition of the maximum aggregate sentence results in sentences that are disproportionate to the nature of the offenses. Defendant asks this court to exercise its authority and reduce his aggregate sentence to "somewhere lower in the permissible one-to-six year aggregate" range or to remand for resentencing.

¶ 31    The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "In determining an appropriate sentence, a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed." (Internal quotation marks omitted.) *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 33, 102 N.E.3d 761. "[A] defendant's rehabilitative potential and other mitigating factors are not entitled to greater weight than the seriousness of the offense." *People v. Shaw*, 351 Ill. App. 3d 1087, 1093-94, 815 N.E.2d 469, 474 (2004). Further, "[t]he existence of mitigating factors does not require the trial court to reduce a sentence from the maximum allowed." *People v. Pippen*, 324 Ill. App. 3d 649, 652, 756 N.E.2d 474, 477 (2001). On review, "[t]he sentence imposed by the trial court is entitled to great deference and will not be reversed *** absent an abuse of discretion." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38, 92 N.E.3d 494.

¶ 32    In this case, defendant was convicted of domestic battery and violation of an order of protection, both of which were Class 4 felonies due to defendant's prior conviction for violating an order of protection. 720 ILCS 5/12-3.2(b), 12-3.4(d) (West 2014). The applicable sentencing range for both offenses was one to three years in prison. 730 ILCS 5/5-4.5-45(a) (West 2014). Additionally, under the Code, a trial court was permitted to impose consecutive terms of imprisonment on the following basis:

> "If, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." *Id.* § 5-8-4(c)(1).

¶ 33    As stated, the record reflects the trial court intended to impose the maximum allowable sentence for both of defendant's convictions. The State contends that although the court erred in sentencing defendant to an extended-term sentence for domestic battery, it did not otherwise abuse its discretion in imposing the maximum allowable sentence. We agree with the State.

- 7 -

¶ 34    Here, the record reflects the trial court considered all of the relevant factors when imposing defendant's sentences and that it explicitly referenced defendant's age, education, and work history as evidence in mitigation. Nevertheless, the court's judgment indicates that it found aggravating factors and the seriousness of the offenses outweighed the mitigating evidence, and we can find no error in that determination.

¶ 35    On appeal, defendant attempts to minimize his criminal history by pointing out that he had no previous felony convictions and that he had never been sentenced to DOC. However, we agree with the court's characterization of his criminal history as "substantial." Defendant had numerous convictions for traffic-related offenses, as well as convictions for the offenses of criminal damage to property, violation of an order of protection, driving under the influence of drugs, and on two occasions, resisting a peace officer. Further, while defendant had no technical felony conviction in his past, he had either pleaded guilty or been found guilty of the felony offense of theft, for which he received a sentence of second chance probation. Defendant was on probation at the time he committed the offenses at issue and a petition to revoke his probation was pending in his theft case.

¶ 36    Additionally, defendant ignores evidence showing that over a period of approximately six years, he was the subject of 12 requests by 10 different women for orders of protection or no contact orders. For 9 of those requests, plenary orders were ultimately entered. Like the trial court, we find this evidence significant as it speaks to defendant's character, rehabilitative potential, and the issue of deterrence. Further, we note that the State presented evidence at sentencing that indicated defendant continued to contact and threaten the victim in this case after the December 2015 incident and after charges had been filed against him. In particular, Meadows testified he answered a call on Dawkins's phone and was able to identify the caller as defendant from speaking with defendant in the past. According to Meadows, defendant threatened both him and Dawkins. Further, although defendant appeared to accept responsibility for his actions at sentencing, the presentence investigation report indicated otherwise, showing that defendant stated the " 'present offense ha[d] been blown out of proportion' " and " 'that it was entrapment.' "

¶ 37    Finally, contrary to defendant's assertions on appeal, we do not find the court's sentence was disproportionate to the nature of the offense. Defendant argues on appeal that the only physical injury to Dawkins was slight bruising to her upper arms. Nevertheless, evidence presented by the State at trial demonstrated that defendant forced his way into Dawkins's residence and, over a 1½- to 2-hour period, threatened her and another individual in the home and took her keys and cell phone. According to the State's evidence, defendant repeatedly hit Dawkins on the face, grabbed her by her arms, and threw her to the ground.

¶ 38    As set forth above, the trial court erred in imposing an extended-term sentence in connection with defendant's domestic battery conviction. However, the record reflects the court's intent to sentence defendant to the maximum sentence allowable for both of his convictions, and given the evidence presented, we can find no abuse of discretion in that determination.

¶ 39                                            C. Monetary Credit

¶ 40    On appeal, defendant lastly contends that he was entitled to $475 in monetary credit toward his fines for the 95 days he spent in custody prior to being sentenced. He argues that the trial court imposed fines in excess of that amount and, although the court awarded him $475 in

monetary credit in its oral ruling, the credit was not properly reflected on the court's written sentencing orders.

¶ 41   Pursuant to section 110-14(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-14(a) (West 2014)), "[a]ny person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant." "However, in no case shall the amount so allowed or credited exceed the amount of the fine." *Id.*

¶ 42   Here, the parties do not dispute that when setting forth its oral ruling, the trial court found defendant entitled to 95 days' presentence credit, as well as "credit for $475 for time spent in custody." There is also no dispute that the court entered written orders, titled "ORDER FOR FINES" and "SUPPLEMENTAL SENTECING ORDER IMPOSING FINES," which set forth fines in excess of that amount. However, neither of the court's written orders as to fines, nor its written sentencing judgment, set forth defendant's entitlement to monetary credit.

¶ 43   We note that a court's oral pronouncement controls over a conflicting written order. *People v. Roberson*, 401 Ill. App. 3d 758, 774, 927 N.E.2d 1277, 1291 (2010). Additionally, a claim for monetary credit under section 110-14 "may be raised at any time and at any stage of court proceedings, even on appeal." *People v. Caballero*, 228 Ill. 2d 79, 88, 885 N.E.2d 1044, 1049 (2008). Accordingly, as the record reflects defendant's entitlement to section 110-14 credit, we direct the trial court to modify its written fine orders to conform with its oral ruling to reflect defendant's entitlement to $475 in monetary credit for his presentence incarceration.

¶ 44                                    III. EPILOGUE

¶ 45   On appeal, the Office of the State Appellate Defender (OSAD) has filed a "motion to expedite decision and for immediate issuance of the mandate." It references the State's concession in its appellee's brief that defendant was not eligible for an extended-term sentence for domestic battery and asserts that "[i]n the interests of justice, it is imperative that [defendant's] appeal be resolved and his sentence be reduced as expeditiously as possible." OSAD continues, stating "[e]ach day that passes without a reduction in the sentence increases the likelihood that [defendant] will spend unwarranted time in prison during the pendency of this litigation." We agree that in cases like this, where a defendant's prison sentence must be reduced and he faces the prospect of serving time in excess of the revised term of years, it is incumbent on *all* parties to be diligent in their work and make every effort to avoid or limit such possible deleterious consequences. Here, however, the urgency OSAD notes in its "motion to expedite decision" is one that it alone created.

¶ 46   The record shows the parties were aware of the trial court's mistake in ordering an extended-term sentence for defendant's domestic battery conviction as they sought to explain that mistake to the court during the hearing on defendant's motion to reconsider sentence on July 7, 2016. The same day, defendant filed his notice of appeal and OSAD was appointed to represent him. However, notwithstanding that a clear mistake had been made by the court when sentencing defendant, OSAD did not file its initial brief in this court until May 9, 2018, 22 months after defendant's appeal was filed. We do not understand the reason for, nor do we condone, this delay by OSAD. The State subsequently filed its brief on September 20, 2018, and defendant filed his reply brief on October 10, 2018. Defendant then filed his "motion to expedite decision" on December 3, 2018. In the motion to expedite, OSAD suggests that upon reduction of his sentence from nine years to six years, defendant's "new out-date will be

January 28, 2019." We have made an effort to expedite our decision in this case. However, there is simply no justification for OSAD to have let defendant's appeal, which held obvious merit, lay dormant for almost two years. We are not unmindful of the tremendous workload faced by OSAD and are appreciative of the generally high-quality representation its attorneys provide defendants throughout this state. Nevertheless, a mechanism for the early identification of appeals such as this, which have obvious merit *and* require remedial action be taken to avoid unwarranted incarceration of a defendant, is overdue.

## IV. CONCLUSION

¶ 48   For the reasons stated, we reduce defendant's sentence for domestic battery to the maximum nonextended term of three years' imprisonment and remand with directions that the trial court modify its written order setting forth imposed fines to conform with its oral ruling and show defendant's entitlement to section 110-14(a) monetary credit. We otherwise affirm the trial court's judgment. The mandate shall issue immediately, but we retain jurisdiction for the filing in due course of Justice Steigmann's special concurrence.

¶ 49   Affirmed as modified and remanded with directions.

¶ 50   JUSTICE STEIGMANN, specially concurring:

## I. BACKGROUND AND ANALYSIS

¶ 52   I fully agree with the majority but write this special concurrence only to highlight that the problem with OSAD's representation—namely, the lack of any triage procedure regarding new cases to which OSAD has been appointed—has existed for decades. The time is long overdue for OSAD to recognize this problem and change its practices so that the injustice that almost occurred in this case—and others—is not repeated.

¶ 53   I, too, agree that OSAD normally does an excellent job representing its clients. However, an unusual case occasionally arises that should not be handled in a routine matter. The present case is one, and an earlier case dealt with by this court, *People v. Shakirov*, 2017 IL App (4th) 140578, is another. What these cases have in common is that both of these defendants—Richard Cisco in the present case and Mansur Shakirov in the earlier case—needed to have their appeals expedited to avoid injustice. Fortunately, this court was able to expedite our handling of Cisco's case and take the unusual step of issuing our mandate early—without the State's objection—so that Cisco would not be kept in prison because of an inappropriate sentence.

¶ 54   However, Shakirov was not so fortunate and suffered a true injustice when this court reversed his conviction after we concluded that the State failed to prove him guilty of reckless homicide beyond a reasonable doubt. That ruling occurred *only after* he had already served his prison sentence on the conviction this court reversed. That should never have happened.

## A. The *Shakirov* Case

¶ 56   The OSAD attorney who wrote the brief to this court on Shakirov's behalf did an excellent job. That brief was very helpful to this court in our coming to a full understanding of that complicated case. Unfortunately—and due to no fault of the OSAD attorney—Shakirov's case

was not briefed in a timely manner, with the result that he served his prison sentence on a conviction that this court reversed.

¶ 57                        1. *The Procedural History of the* Shakirov *Case*

¶ 58        In 2014, the trial court sentenced Shakirov to four years in prison on his reckless homicide conviction. Later that month, the court denied Shakirov's motion to reconsider sentence and appointed OSAD to represent him on appeal. On July 9, 2014, OSAD sent a letter to the McLean County circuit clerk, informing that office that OSAD had been appointed to represent defendant and requesting the preparation of the record on appeal. On August 29, 2014, the McLean County circuit clerk filed the common-law record and the report of proceedings with this court.

¶ 59        According to Illinois Supreme Court Rule 343(a) (eff. July 1, 2008), "[T]he brief of the appellant shall be filed in the reviewing court within 35 days from the filing of the record on appeal." Thus, Rule 343(a) required OSAD to file its brief on Shakirov's behalf by October 3, 2014. Instead, OSAD took no court action in his case until June 20, 2016, when it made a motion in this court for leave to file appellant's brief *instanter*, which this court allowed. Thus, OSAD filed Shakirov's brief 20½ months after its initial due date. Meanwhile, Shakirov began his four-year prison sentence on June 3, 2014, and was released on mandatory supervisory release (MSR) on November 13, 2015. His then-projected MSR discharge date was November 13, 2017.

¶ 60        Under the circumstances of Shakirov's case, OSAD's delay in filing his brief was unconscionable.

¶ 61        An experienced and competent appellate lawyer should have been able to quickly review portions of the record in the *Shakirov* case and recognize it had some unusual features that required closer examination. For example, the presentence report showed Shakirov appeared as directed in the McLean County circuit court from his residence in Spokane, Washington, after posting bond and had no prior criminal record of any kind. Additionally, a review of closing arguments at trial would have revealed a serious question of whether the State's case contained any evidence that defendant "consciously disregarded a substantial and unjustifiable risk" so as to justify his conviction for reckless homicide.

¶ 62        Had a triage procedure been employed in the *Shakirov* case, OSAD likely would have—and should have—filed Shakirov's brief in this court far in advance of when it actually did, and perhaps OSAD might even have filed a motion for bail pending appeal. In any event, had OSAD filed its brief in a timely fashion, there is every reason to believe that Shakirov would have been released from prison before serving 17 months on a conviction that this court ultimately reversed.

¶ 63                                  2. *OSAD's Explanation*

¶ 64        From conversations I have had over the years with both lawyers and administrators of the Fourth District OSAD office, the delay in the *Shakirov* case appears due to OSAD's policy of placing newly filed appeals at the bottom of OSAD's "to-do list" and working on a brief in a particular case only when that case, over time, has risen to the top of the list. In other words, OSAD follows a "first-in, first-out" procedure regarding its appointments to represent indigent defendants on appeal.

¶ 65    In response to my inquiries, as well as those of some of my Fourth District colleagues, OSAD's administration indicated that it employs no triage procedure, wherein an OSAD lawyer would review a case once the record on appeal had been filed to determine whether it should be given a higher priority for the preparation of briefs and, perhaps, even the filing of a motion for bail pending appeal. The OSAD administration has explained that, in its opinion, such a procedure would take too much time and OSAD does not have the necessary staff to perform it.

¶ 66    I emphatically reject OSAD's explanations and deem what happened to Shakirov (and almost happened to Cisco) to be a gross injustice. And I wish to emphasize that the *Shakirov* and *Cisco* cases are hardly exceptional; they are merely two of the most recent examples of the harm OSAD's failure to use triage procedures has caused. During my 30 years on the Fourth District Appellate Court, I have seen far too many similar cases.

¶ 67                    3. *Potential Triage Procedures*

¶ 68    An appropriate triage procedure would require an OSAD attorney to review the record on appeal when filed to determine whether the case had any unusual features, such as (like Shakirov's case) a short prison sentence that a defendant would likely serve if the case were not given higher priority or any unusual factual circumstances or legal issues that would suggest (1) it was not a run-of-the-mill case and (2) it needed to be advanced on the "to-do list." Examples of such circumstances might be strong legal arguments that would warrant reversal or compelling evidence that the defendant is actually innocent.

¶ 69    In conducting such a review when the record on appeal first comes across his or her desk, an experienced appellate lawyer could review specific portions of the record on appeal, such as filings in the common-law record (like the charging instrument and any motions to suppress, or motions *in limine*), the defendant's posttrial motion, the trial court's docket sheet, and perhaps the closing arguments of counsel. The attorney would thereby get a sense of whether the case being reviewed is unusual, meriting giving that case a higher priority than other, routine matters.

¶ 70    I do not believe that an OSAD triage procedure need be unduly time-consuming. Indeed, it should be fairly easy to determine that a given case need *not* be given a higher priority because an attorney could conclude that the case is relatively routine or lacks merit.

¶ 71            4. *This Court's Lack of Scrutiny of OSAD's Motions to Continue*

¶ 72    Perhaps this court deserves some of the blame for the injustice suffered by Shakirov and almost suffered by Cisco. That is, this court established the policy by which we trusted OSAD to handle the cases assigned to it in a competent and timely manner. It appears we were mistaken to do so.

¶ 73    Although OSAD (to its credit) has generally done an excellent job writing briefs on behalf of indigent appellants, OSAD's failure to employ a triage procedure is something this court has been aware of for some time and has not previously addressed, except in informal discussions with OSAD's administration. Thus, we have permitted OSAD, as in the *Shakirov* case, to ignore deadlines under Rule 343(a) for the filing of its briefs and to instead (again, as in the *Shakirov* case) file its brief when ready with a motion for leave to do so *instanter*.

¶ 74                    B. OSAD Needs to Employ a Triage Procedure

¶ 75        In the event that OSAD continues to be unwilling (for whatever reason) to employ a triage procedure as described herein, then this court may be forced to require the OSAD administration to appear in person to move for *any* extensions of time. We could then require this appearance before a panel of this court that is otherwise present on a date set for oral argument and require the OSAD administrator (1) to speak in support of the motion for continuance OSAD has filed and (2) to respond to the court's questions regarding what, if anything, OSAD has done regarding that particular case, so as to avoid repeating the unconscionable circumstances of the *Shakirov* case. We could also require that motions for continuance include the defendant's sentence and his likely release date on MSR.

¶ 76        Like my colleagues, I do not like that OSAD takes so long to file its briefs, and I think they could and should be doing so more quickly. However, I do not see how this court can meaningfully force them to do so. Nevertheless, this court can and should take steps to strongly encourage OSAD to engage in a triage procedure. I think the OSAD administrators would soon discover that it would be easier and less time-consuming to engage in a triage procedure (as I have described it in this special concurrence) than it would be to appear in person before our court and explain what steps, if any, OSAD had taken so we can ensure that what almost happened in this case and what did happen in the *Shakirov* case never happens again. Adopting a triage procedure would also prove to be much less unpleasant.

¶ 77                                    II. CONCLUSION

¶ 78        I enthusiastically reiterate the point the majority made in this case: "[T]here is simply no justification for OSAD to have let defendant's appeal, which held obvious merit, lay dormant for almost two years. *** [A] mechanism for the early identification of appeals such as this, which have obvious merit *and* require remedial action be taken to avoid unwarranted incarceration of a defendant, is overdue." (Emphasis in original.) *Supra* ¶ 46.